**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | | |
|---|---|---|
| PAMELA WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | 5:19-cv-00047-LGW-BWC |
| WAL-MART STORES EAST, LP | ) | |
| And JOHN DOES NOS. 1-10 | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF MOTION TO EXCLUDE
THE OPINIONS OF PLAINTIFF'S EXPERT JEFFREY GROSS**

COMES NOW Defendant Wal-Mart Stores East, LP (hereinafter "Defendant" or "Wal-Mart"), by and through its undersigned attorneys, and, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), files this Brief in Support of Defendant's Motion to Exclude Testimony of Jeffrey H. Gross, Plaintiffs' Expert, respectfully showing the Court, as follows:

**I.   INTRODUCTION**

This is a premises liability case in which Plaintiff Pamela Walker (hereinafter "Plaintiff") asserts claims of negligence against Wal-Mart as a result of a slip and fall on December 14, 2016. Specifically, Plaintiff alleges that Wal-Mart negligently failed to inspect, maintain and clean its floor of foreign substances, and negligently hired or retained unsafe employee(s). (See generally, Plaintiff's Complaint; Dkt 1-1).  Plaintiff further alleges that Defendant failed to adequately warn customers of a potentially hazardous condition on its floor. Plaintiff has proffered the testimony of Jeffrey Gross as an expert in premises liability to support her negligence claims.

1

## II.    BRIEF STATEMENT OF FACTS

### A.    Facts Regarding the Incident at Issue

At approximately 6:00 p.m. on December 14, 2016, Plaintiff and a shopping companion

went to the Walmart store located in Douglas, Georgia, a store she previously visited

"thousands" of times.  (Exhibit "A," Plaintiff's Deposition p. 33, lines 1-12 and 17-18).

Plaintiff's fall, and the events both before and after her fall, were recorded by an in-store security

camera.  (Exhibit "B," in-store surveillance footage from the subject store).  The surveillance

video begins at 5:10 p.m., approximately one hour before Plaintiff's fall. (Exhibit "B").  The

video commences with a Walmart Associate in the area using a mop to dry the floor.  (Exhibit

"B," at 5:10:34 p.m.).  The video also shows that floormats had already been placed on the floor

and that a wet floor sign had been placed in the entryway of the store across from the shopping

cart alley to warn customers of potential rainy-day hazards. [1]  (Exhibit "B," at 6:10:47).  This

sign was in same place at the time of Plaintiff's fall. (Exhibit "B," at 6:10:47).  The sign was

within Plaintiff's line of sight upon her entry to the store. (Exhibit "E," expert report of

Plaintiff's expert Jeff Gross, photograph No. 2). In response to the rainy conditions, the store

also provided paper towels for customer use in the area where Plaintiff fell.[2] (Exhibit "B").

### B.    Testimony of Jeffrey Gross

#### 1.    Qualifications

Mr. Gross testified that he is qualified to offer opinions in this case based "…on [his] 43

years' experience and training, in totality of experience and training…" that "by virtue of his

experience and training [he] possesses more information on certain subjects that the lay person."

---

[1]  Although Plaintiff testified that Wal-Mart Associates brought cones to the area after she fell, this is not supported by the video.  (Exhibit "A," p. 71, lines 3-5).   To the extent that some description of the events given by the parties is flatly and clearly contradicted by the video, such description fails to create a "genuine" issue of fact. See *Scott v Harris*, 530 U.S. 372 (2007).

[2]  As set forth in Jessica Harrelson's affidavit filed in support of Defendant's Motion for Summary Judgment, there were three wet floor signs on display.  (Affidavit of Jessica Harrelson, ¶ 5).

(*See* Deposition of Jeffrey Gross, attached hereto as Exhibit "D," p. 9 and p. 54, lines 18-21.) However, Mr. Gross stated that he does not hold himself out as an expert in "any field." (*Id.* at pp. 54, lines 18-19, 55, line 16, 65 lines 1-5). Rather, Mr. Gross holds himself out as a consultant. *(Id.* at p. 54, lines 18-19 and p. 65 lines 1-5).

Mr. Gross is not a professional engineer. (*Id.* at p. 58, lines 1-4). Mr. Gross is also not a warnings expert or an expert "concerning conspicuity and contrast of color or sending messages or in human factors." (*Id.* at pp. 64-65). Despite his twenty years of working in various safety-related positions for Marriott hotels, Mr. Gross has absolutely no experience in a large, purely retail setting, such as Wal-Mart. *See* CV of Jeffrey Gross and Exhibit D at p. 44, lines 9-14. Regardless of this lack of experience and not considering himself an expert in any field, Mr. Gross has offered opinions against Wal-Mart in "eight to ten" cases over the last twenty years. (*Id.* at p. 57, lines 4-8).[3]

    2.    *Opinions*

Mr. Gross's report contains five opinions. (*See* Expert Report of Jeffrey Gross, attached hereto as Exhibit "F"). All of these opinions relate to the use and placement of warning signs. *Id.* First, Mr. Gross opines that the placement of the wet floor sign was not appropriate to advise customers of the potential hazard. (Exhibit F at p. 2). It is his opinion that the sign was not placed in an area that instructed customers as to what hazard to avoid, nor where the hazard was located. (*Id.* at pp. 20, lines 11-14 and 91-92). In Mr. Gross's words, "the sign in use at the time of the accident is non-instructive as to where the wet floor is or how large an area the wet floor warning sign covers." (Exhibit "F" at p. 2). However, Mr. Gross could not give an answer as to how large

---

[3] When questioned about how many cases in which his opinions have been excluded, Mr. Gross stated that he did not have a list, but that there were cases in which his opinion had been excluded "to some degree." *Id.* at p. 22, lines 15-20. He was unable to answer how many cases in which this has happened. *Id.* at lines 21-22.  When confronted with Orders from cases in which his opinions had been fully or partially excluded from consideration by a jury, Mr. Gross stated that he "did not have a clear recollection," claimed that he decided to exclude his own testimony, and that only a portion of his opinion was excluded. *Id.* at p. 27- 32.

an area the sign would be instructive for, as there is no "effective radius" prescribed for these types of signs. (Exhibit "D" at pp. 84-85 and 86 lines 6-16). In fact, Mr. Gross was not aware of any scientific testing that establishes any "effective radius" of the type of sign in use on the date of the incident. (*Id.* at p. 86 lines 10-16). Mr. Gross also admitted that there is "no one right way" to place these signs, and "no standard at all" regarding how many feet from a hazard a sign should be placed. (*Id.* at p. 122-123).

In his second opinion, Mr. Gross presented photos of what he believes to be an appropriate placement of the sign. (Exhibit F at Photographs 3 and 4). However, he deposed that there are multiple placements of this sign that may be appropriate. (Exhibit D at p. 69 lines 12-15). He bases this opinion solely on his experience. (*Id.* at p. 67 lines 7-23). Mr. Gross was unable to give an answer as to what the dividing line is between "proper" placement of a wet floor sign and an "improper" placement, as "there is none." (*Id.* at p. 80). Mr. Gross's opinion of the "proper" placement of the sign is not based upon any published scientific literature, nor on any scientific testing. (*Id).* No measurements were taken regarding this "proper" placement, as the "photograph speaks for itself." (*Id.* at p. 72). Nor is his opinion based on any scientific study or observation of the traffic flow in the entryway of the subject store. (*Id.* at p. 82, lines 13-18). In fact, Mr. Gross states that the effectiveness of different placements of such floor signs is absolutely not testable. (*Id.* and *Id.* at pp. 74 and 77-78). Mr. Gross could not definitively say that this "appropriate" placement of the sign could have prevented this incident, only that it "would more likely than not provide an earlier warning of the hazardous condition[4]." (Exhibit "F" at p. 2). Mr. Gross goes on to point out that even his "appropriate placement" of the sign is still not instructive as to where the customer should walk. (*Id.)*

---

[4] This opinion is based solely on Mr. Gross's supposition that there was only one sign in use on the date of the incident. (Exhibit "D "at p. 92, lines 12-21).

This opinion is so elementary as to be axiomatic: a more visible sign will give a better warning of a hazard. (Exhibit "D at p. 63 and p. 80). This is not something that would lie outside the knowledge of a lay person. What Mr. Gross does <u>not</u> say is the sign in use was not visible. (*Id*., generally). The sign was not obstructed by anything other than, potentially, other customers as could be the case with any sign. (*Id.* at pp. 63-64 and *See* Screenshot from the Surveillance Footage on the date of the incident, attached hereto as Exhibit "G"). In fact, Mr. Gross's "appropriate placement" of the sign is within the path of the flow of foot traffic into the store, potentially creating a tripping hazard. (Exhibit "F" at Photograph 3).

Thirdly, Mr. Gross opines that the Wal-Mart training materials do not indicate that Defendant's employees are trained in the use of wet floor signs to delineate a hazardous condition. (Exhibit "F" at p. 2). However, during Mr. Gross's deposition he slightly changed this opinion. When confronted with the documents produced by Defendant regarding Wal-Mart's policies and procedures, Mr. Gross acknowledged that the materials do indicate that Defendant's employees are given training on placement of wet floor signs, but stated that training is not specific enough as to where the signs should be placed. (Exhibit "D" at pp. 93-94). Mr. Gross went on to acknowledge that there is no documented "acceptable" method for choosing the number of floor signs to put into use or where to position these signs. (*Id.* at. pp. 97-98). The decision regarding the number of signs and where to place the signs is a "judgement call." (*Id).* Mr. Gross acknowledged that even the American National Standards Institute ("ANSI") Standard Z10, upon which he relied in forming his opinions, does not give any guidance concerning placement of wet floor signs, but rather is a "template" to be utilized during the decision-making process. (*Id.* at p. 89-90). In fact, given the multitude of areas in which a wet floor sign may be utilized, it is impossible to create a standard set of rules regarding placement of wet floor signs. (*Id.).* Accordingly, Mr. Gross gave no opinion as to how the training could have been modified

to qualify as "specific enough" to instruct employees as to the appropriate placement of wet floor signs. (Exhibit "D," generally).

Fourth, Mr. Gross opines that Defendant "failed to institute a hierarchy of safety controls as indicated by the American National Standards Institute Standard Z10…" (Exhibit "F" at p. 3). During his deposition, Mr. Gross conceded that he did not have any evidence that Defendant does not employ professionals familiar with this particular standard, and it is possible that an analysis consistent with this standard could have been performed in formulating specific policies. (Exhibit "D" at pp. 87-88). Mr. Gross would not have any way to definitively determine that the policies and procedures used by Defendant were not the result of such an analysis, as they do not have to be denoted as such. (*Id.* at p. 88, lines 2-8). It appears that Mr. Gross bases this opinion solely on the lack of a "local standard operating policy," despite the existence of a corporate policy that does indicate that a hierarchy of safety controls analysis was performed. (*Id.* at pp. 88-89).  Additionally, Mr. Gross was unable to point to any definitive requirement that Defendant employ or adhere to this standard. (*Id.* at 91). Mr. Gross stated that it is his understanding that this standard has been adopted by OSHA, and thus, is now a federal law or regulation. (*Id.* at pp. 90-91). However, Mr. Gross was unable to point to any specific OSHA violations or how such a violation would be pertinent to this case. (*Id.* at pp. 91).

Finally, Mr. Gross opines that it is "less likely" that Plaintiff would have fallen, had Defendant properly trained its employees regarding the use and placement of wet floor signs and had placed these signs prior to the customer entrance into the area where the potential hazard existed. (Exhibit "F" at p. 3). As discussed above, Mr. Gross conceded that the training materials show that Wal-Mart associates are, in fact, trained on the placement of wet floor signs in multiple scenarios, but took issue with the lack of specificity regarding the placement of the signs. (Exhibit "D" at p. 93, lines 16-23). However, it is also Mr. Gross's opinion that placement

of the wet floor sign is a "judgment call," and that there are multiple areas where the sign could be placed that would have been "proper." (*Id.* at p. 98, lines 5-7, and p. 69, lines 12-15). Though Mr. Gross stood by his opinion that the placement of the wet floor sign would have affected this incident, he was unable to give any scientifically supported reasoning. (*Id.* at p. 97-98). He was only able to rely on his own experiences to support this assertion. (*Id.).*

Mr. Gross testified that he did not rely on any guides, manuals, treatises or publications in forming his opinions in this case. (*Id.* at p. 9). Though he reviewed other documents, (surveillance video, depositions, policies and procedures) he did not rely on any of these in forming his opinions. (*Id.* at pp. 15- 16). He relied almost exclusively on the "totality of his experience and training" in formulating these opinions, citing only two pages of ANSI standards as "supportive" of his opinions. (*Id.* at pp. 9-10). He did not conduct any internet research relevant to his opinions. (*Id.).* In support of his opinion that Defendant failed to institute a hierarchy of safety controls, Mr. Gross points specifically to the ANSI Standard Z10. However, he was not able to give any definitive evidence that Wal-Mart would have been required to follow such a standard. (Exhibit "D," p. 91). In fact, the American Society of Safety Professionals and ANSI state that the "use of American National Standards is *completely voluntary*." (emphasis added) *See* ANSI/ASSP Z10.0-2019, Occupational Health and Safety Management Systems, https://webstore.ansi.org/preview-pages/ASSE/preview_ANSI+ASSP+Z10.0-2019.pdf, accessed November 18, 2020, attached hereto as Exhibit "J," p. 4. Mr. Gross specifically relied on this standard in support of his opinion that the wet floor sign in use was improperly placed. However, Mr. Gross admitted that the Standard does not and cannot give any guidance on where to "properly" place wet floor signs. Exhibit "D" p. 89, lines 7-13.

During his deposition, Mr. Gross indicated that two documents would be "supportive" of his opinions. (Id. at p. 9-10). The first of these documents is a diagram showing examples of a hierarchy of controls. (*See* Examples Hierarchy of Controls produced by Jeff Gross, attached hereto as Exhibit "H").  The only piece of information in this document that could be construed as being applicable to a wet floor sign is the section concerning Warnings/ Administrative. (*Id.)* This section of the document gives "Examples of Warnings…" and includes "Signs." (*Id.).* This document gives no guidance on the proper use of any "Warning."

The second document that Mr. Gross relies on in support of his opinions is a diagram of "ANSI designs for safety component labeling and descriptions of the various hazard levels…" (*See* ANSI Designs for Safety and Component Labeling produced by Jeff Gross, attached hereto as Exhibit "I"). There is no indication whatsoever in this document that it is applicable to wet floor signs. Mr. Gross relies upon this document only for the assertion that "yellow and black cautionary signs" indicate where potential or nonimmediate hazards present a lesser threat of injury and can result in minor injury. (Exhibit "D" at p. 76, lines 16-21). However, Mr. Gross also states that this document indicates OSHA's adoption of the ANSI standards for warning signs, and that these standards for use of cautionary signs apply to warnings to "workers and/or the general public." (*Id.)* Mr. Gross's reliance on this Standard is misplaced. Not only are ANSI Standards completely voluntary, as discussed above, but OSHA regulations are applicable only to "…employment performed in a workplace…" 29 USC §653(a). Thus, contrary to Mr. Gross's assertion, OSHA regulations are not applicable to general public.

### 3.   *Methodology*

In terms of how he formed at his opinions, Mr. Gross stated that he relied "on [his] 43 years' experience and training in totality of experience and training in arriving at [his] opinions in this case." (Exhibit "D" at p. 9, lines 19-22). There is no document or series of documents that

support his opinions. (*Id.* at p. 9, lines 22-24).  He also relied on the surveillance video and measurements taken during a visit to the subject store. (*Id.* at p. 34). Mr. Gross stated that he was able to determine where the sign was placed in relation to where the Plaintiff slipped and fell by watching certain portions of the surveillance video "five, six times," taking a screenshot of the frame where the Plaintiff begins to fall, and using the screen shot to "triangulate a position" as to where the floor sign was. (*Id.*).  Mr. Gross states that the sign was approximately twenty feet inside the store and seventeen feet, four inches to the right of the area where Plaintiff fell. (Exhibit "F" at p. 1). Mr. Gross then uses this measurement to support his opinions regarding the placement of the wet floor sign, and the lack of training in proper placement. However, Mr. Gross is unable to give any tangible technical foundation for this methodology, and specifically admits that there is no standard governing "proper" versus "improper" placement of such a sign, and that whether a placement of a sign is "proper" cannot be tested. (Exhibit "D" at pp. 122-123 and 74, 77-78, 82).

Mr. Gross then goes on to opine that a "proper" placement of the sign would be as shown in the Photograph 3 of his report. (Exhibit "F," Photograph 3). However, Mr. Gross cites no literature or other scientific materials in support of this assertion. Despite the existence of numerous studies on pedestrian obstacle avoidance, Mr. Gross does not cite a single study. (Exhibit "K" expert report of Defendant's expert, John Leffler, PE, p. 3, FN's 1 and 2).  Mr. Gross also did not perform any analysis of the customer traffic at this particular store. (Exhibit "D" p. 82, lines 13-18). Finally, Mr. Gross has done no analysis of the Plaintiff's visual perception and gaze. (*Id.* at pp. 60-61 and 64 at lines 7-11).

With regard to his opinion that proper training of employees and proper placement of the wet floor sign would have made it "less likely" that Plaintiff would have fallen, Mr. Gross did not conduct any analysis to support his opinion. Mr. Gross did not conduct any analysis as to

what, if any, part the floor mat on which Plaintiff walked immediately prior to her fall played in causing her fall. (*Id.* at p. 104, lines 17-25). Mr. Gross did no analysis to determine whether Plaintiff's footwear may have contributed to her fall. *(Id.* at p. 105-106). Mr. Gross performed no scientific testing of the floors of the subject store, nor did he conduct any kinetic analysis of the Plaintiff's fall. (Exhibit "D," generally). This assertion is supported only by Mr. Gross's individual training and experience. (*Id.* at p. 98). It is not supported by any scientific studies, scientific testing, peer review, nor any other methodology accepted within any scientific community. His methodology cannot be tested, and thus, has no known potential error rate.

## III.    ARGUMENT AND CITATION TO AUTHORITY

### A.    <u>Standard for Admissibility</u>

Mr. Gross's opinions are inadmissible because they are not the product of reliable methodology and will not assist the trier of fact as required under Federal Rule of Evidence 702 and the *Daubert* standard.  The district court is charged with the "gatekeeping" obligation to ensure that the fact-finder weighs only sound and reliable evidence, i.e., admissible, relevant expert testimony. To fulfill its "gatekeeping" obligation, the district court is thus charged with: (1) determining whether an expert has the requisite qualifications to offer the opinions given ("qualification requirement")[5]; (2) conducting "an exacting analysis of the foundations of [the] expert opinions to ensure they meet the standards for admissibility" ("reliability requirement"); and, (3) ensuring the relevancy of the expert's testimony (*i.e.*, determining whether the testimony will be helpful to the trier of fact) ("relevancy/helpfulness requirement").  *See Daubert*, 509 U.S. at 591; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *see also Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343, 1350 (N.D. Ga. 2007). While there may be some overlap between these concepts, they are distinct, and courts must be careful

---

[5] Wal-Mart does not concede this prong of the analysis because, as set forth above, he has no experience in a purely retail setting (outside of testifying).

not to conflate them. *Quiet Tech. DC-8 Inc.*, 326 F.3d at 1341. <u>If any step renders the expert's</u> <u>analysis unreliable, the expert's testimony is inadmissible</u>. *Goebel v. Denver & Rio Grande W.* *R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (emphasis provided).

The *Daubert* Court held that trial judges should focus *meticulously* on an expert's principles and methodology. *See Daubert*, 509 U.S. at 595. Furthermore, the Court, "must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *J & V Development, Inc.*, 387 F. Supp. 2d 1214, 1224 (M.D. Ga. 2005) (*citing Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In sum, in acting as a gatekeeper, the Court is responsible for keeping "unreliable and irrelevant information from the jury, because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Bowers,* 537 F. Supp. 2d at 1368 (M.D. Ga. 2007) (internal punctuation and alterations omitted); *see also Kumho,* 526 U.S. at 158-159 (Scalia, J., concurring) (trial court lacks "discretion to abandon the gatekeeping function").

### B. Plaintiff has the burden to establish the admissibility of her expert.

Plaintiff, as the party seeking to use the testimony of Mr. Gross, bears the burden of proving admissibility. *See McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). An integral part of Plaintiffs' burden is to come forward with objective proof that a competent expert's testimony satisfies all of the factors for admissibility. *Daubert v. Merrell Dow* *Pharmaceuticals, Inc*., 43 F.3d 1311, 1316 (9th Cir. 1995) ("The party presenting the expert must show that the expert's findings are based on sound science and this will require some <u>objective</u> <u>independent validation</u> of the expert's methodology.") (Emphasis supplied).

When an expert's opinion is based solely on his experience, the burden is on the proponent to explain how his experience as an expert led to the conclusion he reached, why that

experience was a sufficient basis for that opinion, and just how that experience was reliably applied to the facts of the case. *Jacquillard v. Home Depot U.S.A., Inc.*, No. CV-410-167, 2012 WL 52742, at *5 (S.D. Ga. 2012) (*citing U.S. v. Frazier*, 387 F.3d 1244, 1265 (2004)). If Plaintiff fails to provide sufficient validation of their expert's qualifications, methodology, and reasoning, this Court cannot make the findings required by *Daubert,* and exclusion of Mr. Gross's testimony is required.

### C.   Mr. Gross's opinions do not meet the standard for admissibility, are not relevant, and will not assist the trier of fact.

With respect to the relevancy/helpfulness requirement, expert testimony is deemed to be helpful to the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.  Importantly, "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing argument."  *Id*.  Expert testimony also fails to help the fact-finder if it fails to "fit" with the facts of the case (*i.e.*, when a large analytical leap must be made between the facts and the opinion). *See General Electric v. Joiner*, 522 U.S. 136, 146 (1997). In such instances, "testimony that is otherwise reliable may nevertheless be excluded if it does not have **sufficient bearing on the issue at hand** to warrant a determination that it is helpful to the trier of fact."  *Bowers,* 537 F. Supp. 2d at 1351 (quoting *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114 (10th Cir. 2004)).

In the Eleventh Circuit, "expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Associates Ltd. v. Board of Trustees of Policemen and Firemen Retirement System of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995) (*citing Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962), *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266 (11th Cir. 1993)); *see also United States v. Burchfield*, 719 F.2d 356, 357 (11th Cir. 1983) (holding that the

testimony an expert witness intends to offer must be "the kind that enlightens and informs lay persons without expertise in a specialized field").

In *Abrams v. Walt Disney World*, 370 F. Supp. 2d 1221 (M.D. Fla. 2005), the plaintiff alleged injuries after tripping on a post along the walkway at the defendant's theme park. Plaintiff's "safety consultant" expert opined that the post protruded into the walkway, and was therefore necessarily an obstruction, which was *per se* unsafe. *Id.* at 1224-1225. In excluding the expert's opinions the court noted that whether the post protruded into the walkway, whether the protrusion obstructed the walkway, and whether any and all obstructions in a walkway are unsafe were well within the jury's ken. *Id.* at 1225-1226. In so doing, the Court noted that in the expert witness context, various other courts have found expert testimony as to these "commonly known and observable matters" to be unnecessary. *Id.* at 1225.[6]

In *Sackman v. Balfour Beatty Communities, LLC*,  No. CV-113-066, 2014 WL 4415938 (S.D. Ga. 2014), the plaintiffs filed suit against a property management company after their autistic daughter escaped from the family's house and drowned in a lake nearby. Plaintiffs' expert offered various opinions, including (1) that the defendant should have known the child was a flight risk, (2) should have placed the family in a house further from the lake, (3) should have warned the family about the lake; and (4) that different or extra locks on the family's door would have prevented the child from escaping. *Id.* at *26. The Court held that all of those matters were within the understanding of the average layperson, and the expert's arguments could just as easily be made by plaintiffs' counsel in closing arguments. *Id.*; *see also Frazier*, 387 F.3d at 1262-63. In excluding the expert's testimony, the court concluded, "[i]f an expert can offer

---

[6] *See Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir. 1986) *(*holding that  testimony of expert witness regarding one's ability to see a displaced section of a curb and whether persons wearing heels avoid walking on grates was not helpful to a jury because  the witness was simply repeating what was "common knowledge and common sense"; *Andrews v. Metro North Commuter R.. Co.,* 882 F.2d 705, 708 (2d Cir. 1989) (noting that expert's testimony that railroad platform was "unsafe" which was based on undisputed testimony that the platform was "dirty, filthy and kind of icy,", had trash and ice on it, and was dimly lit. The court determined that deciding whether the platform was "unsafe" based on the undisputed testimony was well within the jury's ken.)

nothing more than his 'stamp of approval' on the plaintiff's case, his testimony 'does nothing to advance a material aspect' of their claims and therefore lacks the indicia of relevance required by Rule 702 and *Daubert*." *Id.* (*quoting Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1315 (N.D.Ga. 2006)).

Lastly, in *Pleasant v. Neesmith Timber Co., Inc.*, No. 408CV192, 2011 WL 2697109 (S.D. Ga. 2010), a case involving a truck driver striking a pedestrian, the Court excluded the testimony of the plaintiff's "trucking safety expert" who intended to testify that the truck driver should have seen the plaintiff pedestrian approaching, that the defendant company's truck was more likely than not the truck involved in the accident, and that the defendant company's truck was at the accident location within the immediate timeframe of the accident. *Id.* at *3. In so doing, the court noted that the expert's opinions did not require any sort of specialized knowledge, or they unnecessarily stated legal or factual conclusions. *Id.* Specifically, the court noted that conclusion of whether the defendant's truck was involved in the accident was a conclusion of fact best left to the jury, because the jury was capable of understanding the evidence about the location of the defendant's truck without the assistance of the expert. *Id.*

1.   *Gross' opinions are not helpful to the jury because they have no bearing on the "issue at hand" in this case.*

In the case at bar, the primary issue with Gross's opinions is that none of them have "sufficient bearing on the issue at hand"—which is whether the rainwater on which Plaintiff slipped constituted a hazardous condition of which Wal-Mart had superior knowledge. A recent opinion from this District sets out a thorough summary of the current state of Georgia rainy day case law. *Miller v. Shaner Hotel Group Ltd. Partnership*, 999 F. Supp. 2d 1298 (S.D. Ga. 2014); *see also Chapman v. Wal-Mart Stores, Inc.*, No. 1:11-CV-03931-RWS, 2013 WL 607851 (N.D. Ga. 2013). As set forth therein, the presence of rainwater in Wal-Mart's entrance was not a hazard. *Id.* Accordingly, the placement of the wet floor sign, it's distance from the potential

hazard, and whether placement in an alternate location may have made the sign more visible, have no bearing on whether Wal-Mart had knowledge superior to that of the Plaintiff concerning whether a hazardous condition existed. As Mr. Gross pointed out, there is no law in the State of Georgia requiring the use of wet floor signs. (Exhibit "D" at pp. 136). Nor is there any case law that requires the imputation of superior knowledge to a Defendant based solely on the Defendant's implementation of wet floor signs on a rainy day. Because Gross' opinions have no bearing on the issue of superior knowledge, his opinions will not assist the trier of fact and should be excluded.

> 2. *The concepts addressed in Gross' opinions are well within the understanding of an average juror.*

Even assuming the relevance of Gross's opinions to the issue at hand in this case, his opinions will not assist the trier of fact; each of them addresses issues well within the understanding of an average layperson. As Gross testified, he developed his opinions based on his review of the written discovery (including the DVR surveillance, and policies and procedures) and depositions in this case. Exhibit D at p. 33. Although he also conducted a "site inspection," his "inspection" consisted of nothing more than using a screenshot from the surveillance video to approximate the position of the sign and taking measurements with a tape measure from this approximate position (which Plaintiff's attorney could do and convey) and taking additional photographs and video of what the accident scene might have looked like (which Plaintiff's attorney could also do).

As discussed, *supra*, Mr. Gross's opinions essentially boil down to the assertion that a more visible sign is more effective. There is absolutely no question that any average juror can employ nothing more than common sense to understand that a visible sign is more effective. Any average juror is capable of looking at the photographs and video in this case and seeing where the sign was. As Mr. Gross performed no scientific analysis or studies that would necessitate

15

explanation to the jury, the determination of whether the sign should have been in alternate position or whether Plaintiff's fall would have been prevented by placing the sign in an alternate location, are determinations any average lay person is capable of making. Mr. Gross's opinions require no specialized knowledge and are not necessary to assist the jury in making these determinations. *Pleasant,* No. 408CV192, 2011 WL 2697109. Because these are all "commonly known and observable matters" Gross's opinions related to them are unnecessary and should be excluded. *Abrams*, 370 F. Supp. 2d at 1225.

As was the case in *Sackman*, all of the matters addressed in Gross's opinions are within the understanding of the average layperson, and his arguments could just as easily be made by plaintiff's counsel in closing arguments. No. CV-113-066, 2014 WL 4415938 at *26; *see also Frazier*, 387 F.3d at 1262-1263. Similar to *Sackman*, Plaintiff attempts to use Gross's opinions as a "stamp of approval" on Plaintiff's case, and his testimony does nothing to advance a material aspect of Plaintiff's claim—rendering it irrelevant. *Id.* (*quoting Dukes v. Georgia*, 428 F. Supp. 2d at 1315).

Also, allowing Mr. Gross to testify about concepts which are easily understood by a layperson is extremely prejudicial to Defendant because of the deference a jury will likely afford to a witness labeled as an "expert" in any subject matter surrounding premises liability.[7] Ordinary slip and fall issues are within the understanding of a layman. Therefore, Mr. Gross's opinions are not helpful to the trier of fact and should be excluded.

**D.** **Mr. Gross's opinions should be excluded because they are not the product of reliable methodology.**

With regard to the reliability requirement, a trial court is to assess whether the reasoning, technique, and/or methodology (collectively referred to as "methodology") underlying the

---

[7] Though Mr. Gross does not "hold himself out" as an expert, Plaintiff has placed Defendant on notice of her intent to present Mr. Gross as such.

expert's testimony is valid, and whether it is proper to apply that methodology to the particular facts at issue. *Frazier*, 387 F.3d at 1262. The Court, "must examine the methodology supporting each expert's opinion step-by-step. If the chain of reliability is broken at one step, then the Court should not admit the expert's opinion…" *J & V Development,* 387 F. Supp. 2d at 1224.

In performing this assessment, the court may consider some or all of the following factors:  (1) whether the expert's methodology has been tested or is capable of being tested; (2) the known and potential error rate of the expert's methodology; (3) whether the methodology has been subjected to peer review and publication; and (4) whether the methodology has been generally accepted in the expert's community. *Daubert*, 509 U.S. at 593-594. In making this determination, the trial court is also free to consider whether the expert: (1) developed his/her opinions expressly for purposes of testifying; (2) unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) adequately accounted for obvious alternative explanations (i.e., performed a differential diagnosis); (4) acted as carefully in performing his/her analysis as he/she does in performing his/her regular professional work outside his/her paid litigation duties; and (5) utilized a field of expertise known to reach reliable results for the type of opinion the expert would give. *See* Fed. R. Evid. 702, Advisory Committee Notes (2000).

In *Daubert*, the Court explained as follows:

> The subject of an expert's testimony must be 'scientific'... 'knowledge.'  The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.

*Daubert*, 509 U.S. at 589-90 (emphasis supplied). Therefore, in order to pass muster, an expert's "proposed testimony must be supported by appropriate validation--*i.e.* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590 (emphasis supplied).  An expert's conclusory statement that something "is" - simply because the expert says so - will not suffice. *See General Electric*, 522 U.S. at 146. "Nothing in *Daubert* requires a [district] court to admit opinion

evidence which is connected to existing data only by the ipse dixit of the expert." *Id.* (*see also Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998)). A proffered expert cannot attach his "expert" conclusion to an opinion that is merely based on common sense and not on a scientific method. *Jaquillard,*   No. CV-410-167, 2012 WL 52742, at *5 ("to allow an expert to give a subjective opinion merely because he is designated as an expert would eliminate the requirement of reliability"); *see also Sackman,* No. CV-113-066, 2014 WL 4415938 at *24 ("[p]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough to carry the proponent's burden") (*citing Cook ex rel. Estate of Tessier v. Sheriff of Conroe Cnty. Fla.,* 402 F.3d 1092, 1113 (11th Cir. 2005)), *McLain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) ("thus neither an expert's qualifications and experience alone nor his unexplained assurance that his or her opinions rely on accepted principles is sufficient").

In *Jaquillard*, the plaintiff slipped and fell in water on the garden center floor of Home Depot. No. CV-410-167, 2012 WL 52742, at *1.  The water resulted from plant watering and Home Depot had several warning signs in place to warn customers of the potential presence of water. *Id.* at *4. Plaintiff's expert, a safety and risk management consultant, opined that any amount of water on a garden center floor created an unreasonable risk for slips and falls. *Id.* at *4-5. In excluding the expert's opinion, the Court focused on the fact that the expert had done no objective, scientific testing on the walking surface at the defendant's store. *Id.* at *5. The Court further noted that his opinion (based on a visit to the store, his review of the depositions and other documents in the case and various pieces of literature) was based on nothing more than common knowledge—that water acts as a lubricant to make walking surfaces more slippery when wet. *Id.* The Court then concluded that it could not allow the expert to attach his "expert" conclusion to an opinion that was merely based on common sense. *Id.* In so doing, the Court

explained that the opinion must be rejected to the extent it was based solely on the expert's experience, since allowing an expert to give a subjective opinion merely because he is designated as an expert, would eliminate the requirement of reliability. *Id.*

The Court also excluded several other opinions proffered by the expert because his methodology failed to qualify as reliable. *Id.* at *5-7. The court based the exclusion on several factors. *Id.* First, the expert had not performed any testing regarding the application of his methodology to slips and falls, and was not aware of any testing of his methodology in general. *Id.* at *6. In fact, the expert explicitly stated that he was not sure if his methodology was "a tested thing." *Id.* As well, the plaintiff offered no evidence of a known error rate for the expert's methodology, and the Court determined that the expert's assurances that his methodology was effective based on his own experience, were insufficient. *Id.* at *7. Finally, the plaintiff also offered no evidence that the expert's methodology was generally accepted within the scientific community. *Id.*

Applying the foregoing analysis to this case, it is clear that Mr. Gross's testimony does not qualify under the *Daubert* standard as reliable and must be excluded. Mr. Gross opined that: (1) the placement of the wet floor sign was not appropriate to warn customers of a potentially hazardous condition and the sign is non-instructive as to the size or location of the potential hazard, (2) an alternate placement of the sign would have provided an earlier warning of a potential hazard, (3) Wal-Mart's employees are not properly trained in the use od wet floor signs to properly delineate a potentially hazardous condition, (4) Wal-Mart failed to institute a hierarchy of safety controls as indicated by ANSI Standard Z10, and (5) proper training and an alternate placement of the wet floor sign would have made it less likely that Plaintiff would have fallen. (Exhibits "F" and "D").

> 1.  *Mr. Gross lacks an identifiable "methodology" and his opinions are simply the product of common sense.*

There are many issues with Gross' methodology as a whole—not the least of which is the fact that he does not appear to have a clearly defined methodology. *Abramson,* 370 F. Supp. 2d 1221.[8] During his deposition, Mr. Gross admitted that his opinions boil down to his individual experience and his application of certain, albeit inapplicable, standards. (Exhibit "D" at p. 98, lines 8-15). Mr. Gross has performed no scientific analysis of any other factors which may have caused or contributed to the Plaintiff's fall, including testing of the floormats, analysis of her clothing or footwear, or her individual visual perception. (*Id*. at pp. 60-61 and 104-106). Mr. Gross has offered no evidence as to the applicability of his methodology specifically to slip and fall cases, and in fact, stated that testing of the effectiveness of wet floor signs with regard to their placement is not possible. (*Id.* at pp. 74, 77-78, and 82). Accordingly, Mr. Gross's methodology, by virtue of being untestable, has no known error rate. The record is also bereft of any evidence that his methods are generally accepted in any scientific community. Instead, Gross expects the court to accept his assurances that his methodology is effective based solely on his previous experience (which does not include <u>any</u> work in a large retail setting).

Mr. Gross takes most issue with Wal-Mart's placement of the wet floor sign. (Exhibit "D" at p. 102, lines 23-24). Mr. Gross's report and his deposition focused solely on the placement of the sign, possible alternate placement of the sign, training surrounding placement of such signs, and what effect he believes an alternate placement of the sign would have had on this incident. (Exhibits "D" and "F"). As discussed, *supra*, he did not perform any scientifically supported tests or studies. As such, he has merely offered his own opinion which essentially amounts to common knowledge— that a more visible sign is more effective. Thus, just like the

---

[8] In excluding the proffered expert, the Court noted, "[t]he difficulty in performing a *Daubert* analysis on this theory is that it was not arrived at by use of any "technique" capable of being evaluated in the scientific community." The Court further noted that the expert did not apply any methodology to arrive at his opinion, but simply looked at the premises in question and deemed an obstruction on the premises walk way unsafe. As a result, the Court concluded, "there is no theory to evaluate, unless it is the underlying assumption that anything that protrudes into an access way is an obstruction and all obstructions are unsafe." *Walt Disney World Co.*, 370 F.Supp.2d at 1224-1225.

expert in *Jaquillard*, Gross is attempting to attach his "expert" conclusion to an opinion which is merely based on common sense—not the scientific method. No. CV-410-167, 2012 WL 52742, at *5. Allowing Gross to give a subjective opinion solely based on experience simply because he is designated as an expert would eliminate the requirement of reliability. *Id.*

> 2.    *Mr. Gross's specific opinions regarding the "improper" placement of the wet floor sign, it's degree of instructiveness, and alternate "proper" placement of the sign are not supported by any objective evidence.*

In opinions one, two and five of his expert report, Mr. Gross gives specific conclusions regarding the wet floor sign at issue, including that the placement of the sign on the date of the incident was "improper," that another placement would have been "proper," and that if the sign had been "properly" placed it is less likely Plaintiff would have fallen. (Exhibit "F" at pp. 2-3). However, these opinions amount to nothing more than pure conjecture, and are not supported by any evidence.[9]

With regard to Mr. Gross's first opinion, he specifically takes issue with the fact that the sign was "approximately seventeen to twenty feet away from the wet floor" on which Plaintiff slipped.[10] Mr. Gross goes on to state that this sign is not appropriate for advising customers of the potential hazard, as it places the customer in the position of trying to determine the "scope and nature" of the potential hazard.  When asked what the "effective radius" of such a sign is, Mr. Gross was unable to answer. (Exhibit "D" at pp. 84-85 and 86 lines 6-16). Mr. Gross was not aware of any scientific testing to determine such a radius, and Mr. Gross conducted no scientific tests to support his opinion that the sign did not effectively warn customers of the potential hazard created by rainwater on the date of the incident. (*Id.* at p. 86 lines 10-16). Finally, there

---

[9] Again, these opinions are based upon the supposition that only one wet floor sign was in use on the date of the incident.

[10] It should be noted that this statement is misleading, as it does not correctly state the position of the sign. Earlier in his report gives a much more specific statement regarding the position of the sign- "the sign was approximately twenty feet inside the store and seventeen feet, four inches to the right of the area where [Plaintiff] fell." (Exhibit "F" at p. 1.)

are no industry accepted standards which would lend any support to this opinion, as no such standards exist governing the proper placement of such a sign. (*Id.* at pp. 122-123).

With regard to Mr. Gross's second opinion that the sign would be more properly placed in the position depicted in photographs three and four included with his report, Mr. Gross states more likely than not given an "earlier" warning of the potential hazard. What Mr. Gross failed to consider in forming this opinion is that this incident occurred in the entryway of the store, and as such, this area of the store is frequently traveled by many customers. On the date of this incident, it had been raining. It is common knowledge that rainwater may be tracked in on the shoes of customers. As the whole area of the entryway is traversed by multiple customers, it is impossible to know where on the floor rainwater may exist. (*See*, generally, Exhibit B, showing multiple customers entering and exiting the store and traversing multiple areas of the area where the incident occurred). Thus, it is impossible to know that placing the sign where Mr. Gross indicated was "proper" would have provide an earlier warning to the Plaintiff or any other customer. Mr. Gross stated that the "issue" when considering the visibility of a wet floor sign, is "to protect the general public." (Exhibit "D," pp. 102-103). However, Mr. Gross's opinions take into account only the area where Plaintiff slipped and fell, and not any other area of the entryway, as the place where a hazard may exist. As stated by Josh Maddox, the Front End Coach of the subject store, when placing a wet floor sign the goals are to: (1) make sure the sign is visible, and (2) does not impeded the flow of customer traffic. (*Id*. at pp. 111). Mr. Gross has presented no evidence that the sign was not visible to Plaintiff or others entering the store. Mr. Gross's "proper" placement of the sign would actually create a tripping hazard as it is placed in the entryway where a customer could potentially trip on the sign itself. (Exhibit "F," Photograph 3). In fact, as Mr. Gross conceded, there is no one proper place for a wet floor sign. (Exhibit "D" at p. 69 lines 12-15).  He did no testing to determine whether the sign was visible to the Plaintiff

as she entered the store and he has also provided no support for his contention that the placement

of the sign shown in the photographs is "proper," as there are no standards that dictate the

"proper" placement of wet floor signs. (*Id.* at p. 80 and pp. 122-123).

> 3.    *Mr. Gross's specific opinion regarding Wal-Mart's alleged failure to institute a "hierarchy of safety controls" is not supported by any objective evidence, including the documents he purports to rely on.*

Mr. Gross's expert report states that Defendant failed to institute the "hierarchy of safety

controls" as set forth in ANSI Standard Z10. (Exhibit "F" at p. 3). Mr. Gross goes on to state that

this Standard specifically addresses warnings or administrative techniques to control hazards.

(*Id.*).  Examples of warnings include signs, and examples of administrative controls include

procedures and training. (*Id.*).  Mr. Gross's expert report gives no evidence as to how he arrived

at the opinion that this specific Standard has not been followed. (*Id.,* generally). In fact, during

his deposition, Mr. Gross conceded that, in fact, Defendant could have followed such a standard

in the development of their training materials. (Exhibit "D" at pp. 87-88). Mr. Gross also

conceded that a black and yellow sign, such as the one in use on the date of the incident, is an

appropriate color scheme for a cautionary wet floor sign, and the appropriateness of this color

scheme is supported by the OSHA standards he cites. (*Id.* at p. 76, lines 22-24). Finally, Mr.

Gross gave no evidence that such standards are in any way required to be adopted or that any

retail industry publication or regulatory body has promulgated or expressly adopted these

standards. (Exhibit "D", generally). In fact, the standard cited by Mr. Gross has no concrete

requirements as far as implementing these cautionary signs, the standard and documents he cites

provide only a "template" to be utilized during the decision-making process. (*Id.* at p. 89-90).

This is also evidenced by the documents presented in support of this opinion by Mr. Gross.

These diagrams present nothing more than examples of warnings and color schemes. (Exhibits

"H" and "I"). The only "instructions" these documents provide are that signs can be used as

warnings and the color of the signs can be used to convey the level of risk associated with the hazard the sign is warning of. (*Id*).

With regard to the specific standard cited by Mr. Gross, ANSI Standard Z10, his reliance on this standard is misplaced. First, adoption of this standard is completely voluntary, and is in no way required by any law or regulation. (Exhibit "J," p. 4). Second, the standard was developed specifically for workplaces. The stated purpose of this standard is to provide "a management tool to improve performance, provide safe workplaces and reduce the risk of occupational injuries…" (Exhibit "J," p. 16). In fact, Mr. Gross referred to this standard as falling under the "general duty clause of OSHA." (Exhibit "D," p. 75, lines 8-13). Any OSHA regulations or duties are irrelevant to this matter, as Plaintiff was not an employee of Wal-Mart. Finally, Mr. Gross is unable to give any specific examples of where the standard would require a wet floor sign to be placed. This is simply because there are none. This standard is "generalized" and must be interpreted "as needed by the user." (*Id*."

It is clear that Mr. Gross came to very specific conclusions from the vague premises contained in the documents he purportedly relied upon. These conclusions are unfounded, and are, quiet obviously, the product of extreme leaps in logic and reasoning. The conclusions reached by Mr. Gross have no specific foundation in the documents that he cites. The conclusions that Mr. Gross reaches are not specifically addressed in any of the supposedly "supportive" materials that he cites. Accordingly, his opinions regarding Wal-Mart's failure to implement and follow a "hierarchy of safety controls" are unreliable because he failed to provide any evidence that the standard cited is binding on Wal-Mart in any way, he failed to provide

evidence that Wal-Mart did not actually follow this standard or another accepted standard, and the documents offered in support of this opinion are not actually instructive or supportive.[11]

## IV.    CONCLUSION

For the reasons set forth herein, as well as the other documents and submittals of record, Wal-Mart respectfully submits that the opinions of Plaintiffs' proffered expert, Jeffrey Gross, are unreliable, irrelevant, and unhelpful to a jury. As such, Plaintiff has not met her burden, and Walmart respectfully requests that this motion be GRANTED, and that the opinions and testimony of Plaintiff's expert Jeffrey Gross be excluded from a trial of this matter.

This 20th day of November, 2020.

**DREW, ECKL & FARNHAM, LLP**

/s/ Garret W. Meader
Garret W. Meader
Georgia Bar No. 142402
Carrie B. Coleman
Georgia Bar No. 602886
777 Gloucester Street, Suite 305
Brunswick, Georgia 31520
(912) 602-6964 (telephone)
gmeader@deflaw.com
colemanc@deflaw.com
*Attorneys for Defendant*

---

[11] It is worth noting that this is not the first time the reliability of Mr. Gross's opinions has been called into question and his opinions have been previously excluded. In another slip and fall case, Billings v. Starwood Realty, Mr. Gross was proffered as an expert to testify that the defendant failed to provide the plaintiff "with an industry-accepted, slip-resistant bathing surface." No. CIVA104CV-3522-JEC, 2006 WL 2639496 at *6 (N.D. Ga. 2006)(emphasis added). However, the Court held that Gross' bald assertion of an "industry standard" was not supported by any industry association published guideline. (Id.). The court noted, "saying that something is or is not an industry guideline does not make it so." (Id.). In granting summary judgment for the defendant, the Court explained that Gross's opinions were "bare, unsupported, and conclusory statements." (Id.). Indeed, the deficiencies in Mr. Gross's opinions provided the basis for the court's grant of summary judgment for the defendant (thus rendering moot the concurrent motion to exclude Mr. Gross's testimony). In the court's opinion, it noted that Mr. Gross's opinions - which are very similar to his opinions in this case -were simply "unsupported and unexplained conclusions." (Id.). Gross was also excluded in another slip and fall case in 2009 based on the unreliability of his opinions. On this basis, this Court should exclude Mr. Gross's unsupported and unexplained opinions because they are not reliable.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

PAMELA WALKER,                    )
                                  )
         Plaintiff,               )
                                  )
v.                                )          CIVIL ACTION
                                  )          FILE NO. 5:19-CV-47
                                  )
WAL-MART STORES EAST, LP          )
and JOHN DOES NOS. 1-10           )
                                  )
         Defendants.              )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in this case in accordance with the

directives from the Court Notice of Electronic Filing ("NEF"), which was generated as a result of

electronic filing.

This 20th day of November, 2020.

DREW, ECKL & FARNHAM, LLP

/s/ Garret W. Meader
Garret W. Meader
Georgia Bar No. 142402
Carrie B. Coleman
Georgia Bar No. 602886
777 Gloucester Street, Suite 305
Brunswick, Georgia 31520
(912) 602-6964 (telephone)
gmeader@deflaw.com
colemanc@deflaw.com
*Attorneys for Defendant*